**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

|  |  |
|---|---|
| UNILOC 2017 LLC,<br><br>        *Plaintiff*,<br><br>    v.<br><br>SAMSUNG ELECTRONICS AMERICA,<br>INC. and SAMSUNG ELECTRONICS<br>CO. LTD.,<br><br>        *Defendants.* | Case No. 2:18-cv-00508-JRG |

## <u>CLAIM CONSTRUCTION MEMORANDUM OPINION AND ORDER</u>

Before the Court is the opening claim construction brief of Uniloc 2017 LLC ("Plaintiff")

(Dkt. No. 42, filed on November 5, 2019),[1] the response of Samsung Electronics America, Inc.

and Samsung Electronics Co., Ltd. (collectively "Defendants") (Dkt. No. 47, filed on November

19, 2019), and Plaintiff's reply (Dkt. No. 48, filed on November 26, 2019). The Court held a

hearing on the issues of claim construction and claim definiteness on December 19, 2019. Having

considered the arguments and evidence presented by the parties at the hearing and in their briefing,

the Court issues this Order.

---

[1] Citations to the parties' filings are to the filing's number in the docket (Dkt. No.) and pin cites are to the page numbers assigned through ECF.

# Table of Contents

**I.**    **BACKGROUND** ........................................................................................... **3**

**II.**    **LEGAL PRINCIPLES** ............................................................................. **4**

    A.    Claim Construction ................................................................................. 4

    B.    Departing from the Ordinary Meaning of a Claim Term ........................ 7

    C.    Functional Claiming and 35 U.S.C. § 112, ¶ 6 (pre-AIA) / § 112(f) (AIA) ........... 8

    D.    Definiteness Under 35 U.S.C. § 112, ¶ 2 (pre-AIA) / § 112(b) (AIA) ................ 10

**III.**    **CONSTRUCTION OF DISPUTED TERMS** ....................................... **11**

    A.    "linked user identification module" ...................................................... 11

    B.    "link between the mobile radiotelephony device and the linked user identification module" ......................................................................... 17

    C.    "a processing of outgoing calls" and "a processing of all outgoing calls" ........... 19

    D.    "deblocking code" ................................................................................ 21

    E.    "protecting a mobile radiotelephony device" ...................................... 24

    F.    "blocking means for preventing a normal operation of the mobile radiotelephony device" ....................................................................... 27

    G.    "timing means for activating the blocking means in response to the mobile radiotelephony device being inactive during the normal operation of the mobile radiotelephony device for a defined period of time subsequent to a mounting of a linked user identification module inside the mobile radiotelephony device" ....................................................................... 32

    H.    "deblocking means for permitting the normal operation of the mobile radiotelephony device in response to a supply of a deblocking code to the mobile radiotelephony device subsequent to the mounting of the linked user identification module inside the mobile radiotelephony device and subsequent to the defined period of time" ........................................... 36

    I.    "locking means for facilitating an activation of the block means by the timing means" and "block means" ..................................................... 41

    J.    "connecting means for establishing a link between the mobile radiotelephony device and the linked user identification module" ...................... 46

    K.    "test means for activating the blocking means when any unlinked user identification module is mounted inside the mobile radiotelephony device" ....... 49

**IV.**    **CONCLUSION** ...................................................................................... **52**

# I.  BACKGROUND

Plaintiff alleges infringement of U.S. Patent No. 6,836,654 (the "'654 Patent"). The patent is entitled Anti-Theft Protection for a Radiotelephony Device. The application includes a priority claim to a foreign application filed on December 21, 1999, and the patent issued on December 28, 2004.

In general, the '654 Patent is directed to technology for protecting a mobile radiotelephony device from unauthorized use.

The abstract provides:

> A mobile radiotelephony device intended for accommodating a linked user identification module offers protection against theft. The device prevents a normal operation of the device with an unlinked identification module, and permits the normal operation of the device with the linked identification module until such time the device has been inactive for a defined period of time. A debugging code can be supplied to the device subsequent to a detection of the defined period of time to again permit the normal operation of the device with linked identification module.

Claim 1, an exemplary device claim, and Claim 10, an exemplary method claim, recite as follows:

> **1.** A mobile radiotelephony device, comprising:
> blocking means for preventing a normal operation of the mobile radiotelephony device, wherein the normal operation includes a processing of outgoing calls;
> timing means for activating the blocking means in response to the mobile radiotelephony device being inactive during the normal operation of the mobile radiotelephony device for a defined period of time subsequent to a mounting of a linked user identification module inside the mobile radiotelephony device; and
> deblocking means for permitting the normal operation of the mobile radiotelephony device in response to a supply of a deblocking code to the mobile radiotelephony device subsequent to the mounting of the linked user identification module inside the mobile radiotelephony device and subsequent to the defined period of time.

> **10.** A method of protecting a mobile radiotelephony device, the method comprising:
> verfying a user identification module mounted inside the mobile radiotelephony device is linked to the mobile radiotelephony device;

detecting a period of inactivity of the mobile radiotelephony device during a normal operation of the mobile radiotelephony device, wherein the normal operation includes a processing of all outgoing calls;

preventing the normal operation of the mobile radiotelephony device in response to the verification of the linked user identification module and in response to the detection of the period of inactivity of the mobile radiotelephony device.

## II.  LEGAL PRINCIPLES

### A.  Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *Id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. The general rule—subject to certain specific exceptions discussed *infra*—is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.") (vacated on other grounds).

"The claim construction inquiry . . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "[I]n all aspects of claim construction, 'the name of the game is the claim.'" *Apple Inc. v. Motorola,*

*Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (quoting *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998)). First, a term's context in the asserted claim can be instructive. *Phillips*, 415 F.3d at 1314. Other asserted or unasserted claims can also aid in determining the claim's meaning, because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.* For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id.* at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The prosecution history is another tool to supply the proper context for claim construction because, like the specification, the prosecution history provides evidence of how the U.S. Patent

and Trademark Office ("PTO") and the inventor understood the patent. *Phillips*, 415 F.3d at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* at 1318; *see also Athletic Alts., Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguous prosecution history may be "unhelpful as an interpretive resource").

Although extrinsic evidence can also be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are not helpful to a court. *Id.* Extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.* The Supreme Court has explained the role of extrinsic evidence in claim construction:

> In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period. *See, e.g., Seymour v. Osborne*, 11 Wall. 516, 546 (1871) (a patent may be "so interspersed with technical terms and terms of art that the testimony of scientific witnesses is indispensable to a correct understanding of its meaning"). In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the "evidentiary underpinnings" of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal.

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

## B.    Departing from the Ordinary Meaning of a Claim Term

There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution."[2] *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)); *see also GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."). The standards for finding lexicography or disavowal are "exacting." *GE Lighting Sols.*, 750 F.3d at 1309.

To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *Id.* (quoting *Thorner*, 669 F.3d at 1365); *see also Renishaw*, 158 F.3d at 1249. The patentee's lexicography must appear "with reasonable clarity, deliberateness, and precision." *Renishaw*, 158 F.3d at 1249.

To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender. *Cordis Corp. v. Boston Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009); *see also Thorner*, 669 F.3d at 1366 ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."). "Where an applicant's statements are amenable

---

[2] Some cases have characterized other principles of claim construction as "exceptions" to the general rule, such as the statutory requirement that a means-plus-function term is construed to cover the corresponding structure disclosed in the specification. *See, e.g., CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002).

to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

### C.  Functional Claiming and 35 U.S.C. § 112, ¶ 6 (pre-AIA) / § 112(f) (AIA)

A patent claim may be expressed using functional language. *See* 35 U.S.C. § 112, ¶ 6; *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347–49 & n.3 (Fed. Cir. 2015) (en banc in relevant portion). Section 112, Paragraph 6, provides that a structure may be claimed as a "means . . . for performing a specified function" and that an act may be claimed as a "step for performing a specified function." *Masco Corp. v. United States*, 303 F.3d 1316, 1326 (Fed. Cir. 2002).

But § 112, ¶ 6 does not apply to all functional claim language. There is a rebuttable presumption that § 112, ¶ 6 applies when the claim language includes "means" or "step for" terms, and that it does not apply in the absence of those terms. *Masco Corp.*, 303 F.3d at 1326; *Williamson*, 792 F.3d at 1348. The presumption stands or falls according to whether one of ordinary skill in the art would understand the claim with the functional language, in the context of the entire specification, to denote sufficiently definite structure or acts for performing the function. *See Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1372 (Fed. Cir. 2015) (§ 112, ¶ 6 does not apply when "the claim language, read in light of the specification, recites sufficiently definite structure" (quotation marks omitted) (citing *Williamson*, 792 F.3d at 1349; *Robert Bosch, LLC v. Snap-On Inc.*, 769 F.3d 1094, 1099 (Fed. Cir. 2014))); *Williamson*, 792 F.3d at 1349 (§ 112, ¶ 6 does not apply when "the words of the claim are understood by persons of ordinary skill in the art to have sufficiently definite meaning as the name for structure"); *Masco Corp.*, 303 F.3d at 1326 (§ 112, ¶ 6 does not apply when the claim includes an "act" corresponding to "how the function is performed"); *Personalized Media Commc'ns, L.L.C. v. Int'l Trade Comm'n*, 161 F.3d 696, 704 (Fed. Cir. 1998) (§ 112, ¶ 6 does not apply when the claim includes

"sufficient structure, material, or acts within the claim itself to perform entirely the recited function . . . even if the claim uses the term 'means.'" (quotation marks and citation omitted)).

When it applies, § 112, ¶ 6 limits the scope of the functional term "to only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof." *Williamson*, 792 F.3d at 1347. Construing a means-plus-function limitation involves multiple steps. "The first step . . . is a determination of the function of the means-plus-function limitation." *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). "[T]he next step is to determine the corresponding structure disclosed in the specification and equivalents thereof." *Id.* A "structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Id.* The focus of the "corresponding structure" inquiry is not merely whether a structure is capable of performing the recited function, but rather whether the corresponding structure is "clearly linked or associated with the [recited] function." *Id.* The corresponding structure "must include all structure that actually performs the recited function." *Default Proof Credit Card Sys. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005). However, § 112 does not permit "incorporation of structure from the written description beyond that necessary to perform the claimed function." *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999).

For § 112, ¶ 6 limitations implemented by a programmed general purpose computer or microprocessor, the corresponding structure described in the patent specification must include an algorithm for performing the function. *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999). The corresponding structure is not a general purpose computer but rather

the special purpose computer programmed to perform the disclosed algorithm. *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008).

### D. Definiteness Under 35 U.S.C. § 112, ¶ 2 (pre-AIA) / § 112(b) (AIA)

Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112, ¶ 2. A claim, when viewed in light of the intrinsic evidence, must "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). If it does not, the claim fails § 112, ¶ 2 and is therefore invalid as indefinite. *Id.* at 901. Whether a claim is indefinite is determined from the perspective of one of ordinary skill in the art as of the time the application for the patent was filed. *Id.* at 911. As it is a challenge to the validity of a patent, the failure of any claim in suit to comply with § 112 must be shown by clear and convincing evidence. *BASF Corp. v. Johnson Matthey Inc.,* 875 F.3d 1360, 1365 (Fed. Cir. 2017). "[I]ndefiniteness is a question of law and in effect part of claim construction." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012).

When a term of degree is used in a claim, "the court must determine whether the patent provides some standard for measuring that degree." *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1378 (Fed. Cir. 2015) (quotation marks omitted). Likewise, when a subjective term is used in a claim, "the court must determine whether the patent's specification supplies some standard for measuring the scope of the [term]." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1351 (Fed. Cir. 2005). The standard "must provide objective boundaries for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014).

In the context of a claim governed by 35 U.S.C. § 112, ¶ 6, the claim is invalid as indefinite if the claim fails to disclose adequate corresponding structure to perform the claimed function. *Williamson*, 792 F.3d at 1351–52. The disclosure is inadequate when one of ordinary skill in the

art "would be unable to recognize the structure in the specification and associate it with the corresponding function in the claim." *Id.* at 1352.

## III.   CONSTRUCTION OF DISPUTED TERMS

### A.   "linked user identification module"

| Disputed Term[3] | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "linked user identification module"<br><br>• '654 Patent Claims 1, 10, 17 | ordinary meaning<br><br>alternatively:<br>• user identification module linked to the device | a user identification module that is only one that permits normal operation of the device[4] |

**The Parties' Positions**

Plaintiff submits: Given Defendants' use of "user identification module" in its proposed construction, Defendants are proposing that "linked" be rewritten to include at least four limitations that are not found in the plain and ordinary meaning of the term:

> (1) the user identification module has data; (2) that data has been read by the mobile radio telephony device; (3) that data has been stored on the mobile radio telephony device; and (4) the user identification module must be the only one that permits normal operation of the device.

But these limitations are not supported by any special definition of 'linked' found in the '654 Patent or in its prosecution history. Indeed, the patent teaches an embodiment in which calls may be made with non-linked user identification modules (citing '654 Patent col.4 ll.23–30), which contradicts Defendants' proposal. Further, the patent teaches that some of Defendants' proposed

---

[3] For all term charts in this order, the claims in which the term is found are listed with the term but: (1) only the highest-level claim in each dependency chain is listed; and (2) only claims identified in the Parties' Amended Joint Claim Construction Chart (Dkt. No. 52) are listed.

[4] Defendants originally proposed and argued "a user identification module whose data has been read by, and stored on, the mobile radio telephony device, and that is only one that permits normal operation of the device." (Dkt. No. 47 at 4; *see also* Parties' Joint Claim Construction Chart, Dkt. No. 51-2 at 2.)

limitations are provided by a "connecting means" that is separately claimed in dependent Claim 5, which indicates that these limitations are not present in the "linked user identification module." Further, as disclosed in the prior-art U.S. Patent No. 5,913,175 ("*Pinault*") and as recognized by the examiner during prosecution, "linked user identification module" has a broader meaning than Defendants propose. (Dkt. No. 42 at 3–6.)

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '654 Patent col.1 ll.21–27, col.1 l.66 – col.2 l.3, col.4 ll.23–30; '654 Patent File Wrapper August 27, 2003 Office Action at 4 (Plaintiff's Ex. C, Dkt. No. 42-4 at 6), December 2, 2003 Response (Plaintiff's Ex. D, Dkt. No. 42-5), May 20, 2004 Response (Plaintiff's Ex. E, Dkt. No. 42-6), August 24, 2004 Notice of Allowability at 3 (Plaintiff's Ex. F, Dkt. No. 42-7 at 4); *Pinault* at col.1 ll.32–44 (Plaintiff's Ex. B, Dkt. No. 42-3).

Defendants respond: As provided in each of the claims of the '654 Patent, the "linked user identification module" is mounted in the mobile telephony device to enable normal operation of the device. Absent a linked user identification module, the device cannot make outgoing calls. Thus, a device with an unlinked user identification module cannot make outgoing calls. Contrary to Plaintiff's assertion, the patent does not teach that a device with an unlinked user identification module may make outgoing calls but rather teaches only that such a configuration may allow incoming calls (citing '654 Patent fig.3, col.3 ll.44–48, col.4 ll.23–30). The "linked" aspect of the user identification module requires more than just placing a user identification module in the device, else "linked" would be superfluous. A user identification module becomes linked "when its data is read by, and stored on, the mobile device." Further, the prior-art *Pinault* patent that Plaintiff posits supports a broad plain-and-ordinary meaning instead teaches a user identification

module that is linked by reading and storing data from the module and that is necessary to enable normal operation of the device. (Dkt. No. 47 at 4–8.)

In addition to the claims themselves, Defendants cite the following intrinsic and extrinsic evidence to support their position: **Intrinsic evidence**: '654 Patent, at [57] Abstract, figs.2–3, col.1 ll.6–11, col.1 ll.24–29, col.1 ll.40–51, col.1 l.60 – col.2 l.10, col.2 ll.48–60, col.2 l.67 – col.3 l.6, col.3 ll.14–31, col.3 ll.44–48, col.4 ll.7–30; *Pinault* at col.3 l.49 – col.4 l.5 (Plaintiff's Ex. B, Dkt. No. 42-3). **Extrinsic evidence**: Medvidovic Decl.[5] ¶¶ 35–36, 38–41 (Defendants' Ex. 1, Dkt. No. 47-2).

Plaintiff replies: "Linked" is a commonplace term and it was not redefined in the patent or during prosecution and therefore should be given its plain and ordinary meaning. (Dkt. No. 48 at 1–2.)

**Analysis**

The issue in dispute distills to whether a "linked" user identification module is any user identification module somehow connected to the mobile device or is a specific user identification module that uniquely enables normal operation of the device. A user identification module is "linked" to the device when it is the only user identification module that enables normal operation of the device.

The "linked" user identification module is the only user identification module that enables normal operation of the mobile device. Indeed, the point of linking the module and the mobile device is to prevent unauthorized use of the mobile device. For example, the '654 Patent explains:

> The invention relates to a mobile radiotelephony device intended for accommodating a user identification module, where the device has an established link to an identification module to thereby ***prevent a normal operation of the device***

---

[5] Declaration of Nenad Medvidovic, Ph.D. in Support of Defendants' Proposed Claim Constructions

> ***when an identification module <u>other than the linked identification module</u> is
> mounted inside the device***.

'654 Patent col.1 ll.6–11 (emphasis added). The purported advance over the *Pinault* prior-art

patent was not that the invention of the '654 Patent allows normal operation with an unlinked user

identification module, but rather that it could prevent normal operation even with a linked module:

> U.S. Pat. No. 5,913,175 [*Pinault*], published Jun. 15, 1999 describes a method of
> protecting a radiotelephone which permits to avoid that the lost or stolen telephone
> can be used by a third party with another user identification module. ***This method
> comprises establishing a link between the device and a specific user identification
> module and blocking the normal operation of the device when the user
> identification module that is placed inside the device <u>is not the one that is linked
> to the device</u>***.

> When the device is lost or stolen with the identification module to which it is linked,
> the user is to warn the operator so that the use of his identification module is blocked
> at network level.

> This means that the device can be freely used until the identification module to
> which it is linked is blocked via the network. This may take a certain period of time.

> . . .

> It is notably an object of the invention to resolve this problem. For this purpose, a
> device in accordance with the invention (1) verifies a user identification module
> mounted inside the mobile radiotelephony device is linked to the mobile
> radiotelephony device, (2) detects a period of inactivity of the mobile
> radiotelephony device during a normal operation of the mobile radiotelep[h]ony
> device, wherein the normal operation includes a processing of all outgoing calls,
> and (3) ***prevents the normal operation*** of the mobile radiotelephony device in
> ***response to the verification of the user identification module <u>and</u> in response to
> the detection of the period of inactivity of the mobile radiotelephony device***.

*Id*. at col.1 ll.21–50 (emphasis added).

Neither the *Pinault* prior-art patent nor the '654 Patent provide any example in which a mobile

device linked to a linked user identification module may operate normally without the linked user

identification module. Plaintiff's reliance on the '654 Patent's disclosure at column 4, lines 23–30

is misplaced. The patent there provides:

> In another embodiment the same blocking means are used as the identification module which is placed inside the device either or not linked to the device, for example, the second blocking means. In that case it is possible for receiving incoming calls intended for the identification module that is inside the device, even when this identification module placed inside the device is not linked to the device.

This does not teach that an unlinked module can enable normal operation of the mobile device. Rather, it provides that a mobile device with an unlinked module may operate according to the second blocking means. As described in more detail below in the section on the "blocking means" term, the second blocking means corresponds to a state in which the mobile device processes incoming calls only (and, alternatively, also outgoing calls to emergency numbers) after a certain period of inactivity following mounting of the linked user identification module in the device. *Id.* at col.3 ll.31–48. This second blocking state is not the normal mode of operation. And the patent describes a first blocking state in which the mobile device is disconnected from the network if the linked user identification module is not mounted in the device. *Id.* at col.3 ll.14–30. Thus, the disclosure at column 4, lines 23–30 simply teaches an alternative blocking state to the first blocking state for the case that an unlinked user identification module rather than the linked user identification module is mounted in the device. *Pinault* likewise does not teach normal operation without the linked user identification card. Instead, *Pinault* provides:

> a terminal of a cellular mobile radio system . . . being able to operate in at least two separate operating modes, namely a normal mode in which it can be used with any user card and a locked mode in which it can be used only with the user card to which it is locked, constituting a linked user card.

*Pinault* at col.3 ll.49–57.

The term "linked" is not used in the '654 Patent, or *Pinault*, to encompass simple physical connections that might fall under some plain and ordinary meanings of the term. In both *Pinault* and the '654 Patent, locking the mobile device creates the linked user module (or card) and thereby disables normal operation without the linked module. For example, *Pinault* provides:

It is therefore necessary to create a link between the terminal and the user card and to authenticate this terminal/user card link in order to prevent the use in the locked mode of a user card other than the linked user card.

In accordance with the invention, the link creation phase consists in storing first locking data in a memory area of the linked user card. As explained in more detail in the remainder of the description, this creation phase can be carried out either during manufacture of the user card or on each change from the normal mode to the locked mode.

*Pinault* at col.7 ll.46–55. The '654 Patent similarly provides for the linking:

When the user locks his device (box K2), the identification module that is inside the device is automatically linked to the device. For this purpose, the device starts reading a data D1 in the identification module (for example, the international identification number IMSI) and he stores it in the random-access memory 24. . . . If [the device] is locked (arrow Y3) one looks whether the identification module which is placed inside the device is the one that is linked to the device (box K4).

If the identification module, which is placed inside the device, is not the one that is linked to the device (arrow N4), the device goes to a first blocking state indicated in box KS.

'654 Patent col.2 l.66 – col.3 l.16. By its nature, the "linked" module is the module that is necessary for the normal operation of the locked mobile device and the existence of the linked module is premised on the device being locked. The '654 Patent repeatedly describes and claims physically connecting either a linked module or an unlinked module, meaning that physically connecting a module to a device (e.g., by inserting it into the device or attaching it to the device via a chain link) does not mean the device is "linked" as "linked" is used in the patent. *See, e.g.*, col.3 ll.14–15 ("If the identification module, which is placed inside the device, is not the one that is linked to the device (arrow N4) . . . ."), col.5 ll.24–26 (Claim 9: ". . . when any unlinked user identification module is mounted inside the mobile radiotelephony device"). In the context of the '654 Patent, which is the only proper context, the "linked user identification module" is the one that protects against unauthorized use of the mobile device by being uniquely able to enable normal operation of the device. *See Phillips*, 415 F.3d at 1316 (en banc) ("'The construction that stays true to the

claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.'" (quoting *Renishaw PLC*, 158 F.3d at 1250); *see also Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1363 (Fed. Cir. 2016) ("The only meaning that matters in claim construction is the meaning in the context of the patent.").

Accordingly, the Court construes "linked user identification module" as follows:

- "linked user identification module" means "a user identification module that is the only one that permits normal operation of the device."

**B.** **"link between the mobile radiotelephony device and the linked user identification module"**

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "link between the mobile radiotelephony device and the linked user identification module" <br><br> • '654 Patent Claims 5, 7, 14 | ordinary meaning | association between the mobile radiotelephony device and the user identification module such that the user identification module is the only one that permits normal operation of the device |

**The Parties' Positions**

Plaintiff submits: The other words of the claims "help define" the claimed link between the device and the module, and the claims do not limit the link to one which restricts normal operation of the device absent an association between the device and a linked user identification module, as Defendants propose. In fact, "link" was known in the art to include "installing or connecting" a module to a device. Further, the '654 Patent teaches making calls using a non-linked user identification module. Defendants' proposal improperly imports limitations from exemplary embodiments. (Dkt. No. 42 at 6–8.)

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '654 Patent col.4 ll.23–30.

Defendants respond: As described and claimed in the '654 Patent, the "link" between the device and the linked user identification module is an association formed when the data on the module is read by and stored on the device. And this association is necessary for normal operation of the device outside of which outgoing calls are disabled. (Dkt. No. 47 at 8–10.)

In addition to the claims themselves, Defendants cite the following intrinsic and extrinsic evidence to support their position: **Intrinsic evidence**: '654 Patent, at [57] Abstract, fig.3, col.1 ll.6–11, col.1 ll.40–51, col.1 l.60 – col.2 l.10, col.2 l.67 – col.3 l.6, col.3 ll.14–31, col.4 ll.7–30; '654 Patent File Wrapper August 27, 2003 Office Action (Plaintiff's Ex. C, Dkt. No. 42-4 at 4–5), February 19, 2004 Office Action (Plaintiff's Ex. H, Dkt. No. 42-9 at 4); *Pinault* col.3 l.49 – col.4 l.5 (Plaintiff's Ex. B, Dkt. No. 42-3). **Extrinsic evidence**: Medvidovic Decl. ¶¶ 37, 44–48 (Defendants' Ex. 1, Dkt. No. 47-2).

Plaintiff replies: Some claims (e.g., Claim 16) are expressly directed to preventing normal operation with an unlinked user identification module, which means it would be improper to read such a limitation into other claims. (Dkt. No. 48 at 2–3.)

<u>**Analysis**</u>

The issue in dispute here is the same as the issue regarding the "linked user identification module" addressed above: whether a "linked" user identification module is any user identification module somehow connected to the mobile device or is a specific user identification module that uniquely enables normal operation of the device. As explained above, the "linked" user identification module is the only user identification module that will enable normal operation of the mobile device. At the hearing, the parties agreed that resolution of the dispute over the meaning of "linked user identification module" resolves the dispute over the "link between . . ." term.

Accordingly, the Court determines that no construction of this term is necessary.

### C. "a processing of outgoing calls" and "a processing of all outgoing calls"

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "a processing of outgoing calls"<br><br>• '654 Patent Claim 1 | ordinary meaning | ability to make outgoing calls |
| "a processing of all outgoing calls"<br><br>• '654 Patent Claims 10, 17 | ordinary meaning | ability to make all outgoing calls |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

**The Parties' Positions**

Plaintiff submits: These terms were not defined in the '654 Patent or during prosecution and their ordinary meanings will be "readily understood by any laymen." Further, while successful processing of a call indicates an ability to make a call, the ability alone does not mean calls are actually processed. (Dkt. No. 42 at 8.)

Defendants respond: The claims provide that "normal operation" of the device "includes a processing of outgoing calls" or "includes a processing of all outgoing calls." And the claims and description are directed to disrupting this "normal operation" by preventing the transmission of outgoing calls. Thus, the "processing of outgoing calls" refers to the ability to make outgoing calls. Further, Plaintiff agreed to Defendants' proposed construction in co-pending litigation over the '654 Patent.[6] (Dkt. No. 47 at 10–11.)

---

[6] Defendants cite the Joint Claim Construction Statement pursuant to P.R. 4-3(d) submitted on November 5, 2019, as Dkt. No. 121 in *Uniloc 2017 LLC v. Google LLC*, Case No. 2:18-cv-00493-JRG-RSP (E.D. Tex.) and submit that Statement here as Defendants' Exhibit 2. (Dkt. No. 47-3.)

In addition to the claims themselves, Defendants cite the following intrinsic and extrinsic evidence to support their position: **Intrinsic evidence**: '654 Patent col.1 ll.5–65, col.3 ll.14–31, col.3 ll.44–48, col.3 ll.58–63, col.4 ll.7–22. **Extrinsic evidence**: Medvidovic Decl. ¶¶ 51–56 (Defendants' Ex. 1, Dkt. No. 47-2).

Plaintiff replies: Its agreement to Defendants' proposed construction "in a different case, with a different party, does not create any estoppel or indicate [Plaintiff's] agreement that the plain and ordinary meaning of a term has been established by that agreement." (Dkt. No. 48 at 3.)

### <u>Analysis</u>

The issue in dispute appears to be whether the ability to make outgoing calls alone is the same as processing outgoing calls. It is not. While processing outgoing calls necessarily entails the ability to make outgoing calls, it requires more—processing the calls requires actually making the calls.

Under the plain meanings of these terms, "processing" of outgoing calls denotes more than an ability to make the calls, it denotes actual exercise of that ability. The Court is concerned that Plaintiff is proposing in another case the very construction it here contends is incorrect. That said, the Court's obligation extends beyond simply selecting one party's construction over another's. *Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1555 (Fed. Cir. 1995) ("the trial judge has an independent obligation to determine the meaning of the claims, notwithstanding the views asserted by the adversary parties"). And Defendants essentially ask the Court to rewrite "processing" as "having the ability to process." This does not comport with the plain meaning of the terms and no support for such a redefinition is found in the '654 Patent. "Processing of outgoing calls" means just that, the mobile device makes the outgoing calls.

Accordingly, the Court construes "a processing of outgoing calls" and "a processing of all outgoing calls" as follows:

- "a processing of outgoing calls" means "making outgoing calls" and

- "a processing of all outgoing calls" means "making all outgoing calls."

### D. "deblocking code"

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "deblocking code"<br><br>• '654 Patent Claims 1, 11, 18 | ordinary meaning | a PIN (Personal Identity Number) used to unlock/unblock the device |

### The Parties' Positions

Plaintiff submits: Both "deblocking" and "code" are understandable to a layperson, therefore there is no need to construe this term. And a "deblocking code" is not necessarily a PIN. Rather, the '654 Patent teaches that a PIN is an exemplary deblocking code and a PIN is specified as the deblocking code in dependent claims. (Dkt. No. 42 at 8–9.)

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '654 Patent col.3 ll.40–42, col.4 ll.4–6, col.4 ll.23–30.

Defendants respond: The parties dispute whether the ordinary meaning of "deblocking code" encompasses patterns or biometrics; thus, an "ordinary meaning" construction does not resolve the parties' dispute. The blocking code is described in the patent as a PIN and "deblocking code" and "PIN" are used interchangeably in the prosecution history. Thus, the "deblocking code" is a PIN. Further, PIN is used in the art to indicate a code that is used to enable a device to make or receive calls, a "deblocking code." (Dkt. No. 47 at 11–13.)

In addition to the claims themselves, Defendants cite the following intrinsic and extrinsic evidence to support their position: **Intrinsic evidence**: '654 Patent col.2 ll.11–17; '654 Patent File

Wrapper August 27, 2003 Office Action (Plaintiff's Ex. C, Dkt. No. 42-4 at 4–5), February 19, 2004 Office Action (Plaintiff's Ex. H, Dkt. No. 42-9 at 10), May 20, 2004 Response (Plaintiff's Ex. E, Dkt. No. 42-6 at 9–10). **Extrinsic evidence**: Medvidovic Decl. ¶¶ 59–60 (Defendants' Ex. 1, Dkt. No. 47-2); European Telecommunications Standards Institute, *GSM Technical Specification 02.30 Digital cellular telecommunications system (Phase 2+); Man-Machine Interface (MMI) of the Mobile Station (MS)* at 11 (Defendants' Ex. 4, Dkt. No. 47-5 at 3); European Telecommunications Standards Institute, *Universal Mobile Telecommunications System (UMTS); USIM and IC Card Requirements (3G TS 21.111 version 3.0.1 Release 1999)* at 7 (Defendants' Ex. 5, Dkt. No. 47-6 at 4).

Plaintiff replies: A "deblocking code" may be a PIN but is not necessarily a PIN. (Dkt. No. 48 at 3–4.)

**Analysis**

The issue in dispute that is squarely presented to the Court is whether "deblocking code" should be limited to a PIN. It should not.

The "deblocking code" is not specially defined as a PIN in the '654 Patent. Rather, a PIN is expressly exemplary. *See, e.g.*, '654 Patent col.3 ll.37–43 ("If this is the case . . ., the device passes on to a second blocking state . . . by passing through an initialization step . . . which permits to initialize a variable A which represents the number of attempts made at supplying a deblocking code (*for example*, the Personal Identification Number) PIN." (emphasis added)). And using a PIN as the deblocking code is separately claimed in dependent claims. *See, e.g.*, *id.* at col.5 ll.19–22 (Claim 8: "a personal identification number stored on the linked user identification module is stored as the deblocking code"). Defendants' proposed construction threatens to render these

dependent claims entirely superfluous. Finally, Defendants' extrinsic evidence establishes merely that a PIN may be used as a deblocking code, not that a deblocking code is necessarily a PIN.

This issue of whether the scope of "deblocking code" encompasses such things as a pattern or biometric has not been properly presented to the Court. While Defendants have identified this as a dispute and have presented evidence that "deblocking code" encompasses PINs used to unblock mobile phones, they have not established that "deblocking code" or "code" is limited to PINs at the relevant time (at the '654 Patent's priority date). Defendants have similarly failed to prove "that a pattern or biometric (e.g., fingerprint, retinal scan, etc.) is [necessarily not] a 'code' under the ordinary meaning of that term." (Dkt. No. 47 at 11.) At the hearing, Defendants asserted that patterns and biometrics would not fall within the meaning of "code" at the relevant time and that "deblocking code" should be construed to capture its meaning as of the effective filing date of the '654 Patent, which does not include patterns and biometrics.

The Court understands that a claim term should be given the meaning it had as of the effective filing date. *See, e.g.*, *Schering Corp. v. Amgen Inc.*, 222 F.3d 1347, 1353 (Fed. Cir. 2000) ("this court must determine what the term meant at the time the patentee filed the [patent] application"); *Mass. Inst. of Tech. v. Abacus Software*, 462 F.3d 1344, 1352 (Fed. Cir. 2006) ("In determining the meaning of a term within the pertinent art, it is appropriate to determine [its use] at the time the patent application was filed."). On the other hand, claim scope is not limited to the embodiments described in the patent. *See, e.g.*, *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1369 (Fed. Cir. 2012) ("a patentee need not describe in the specification every conceivable and possible future embodiment of his invention" (quotation marks omitted)); *Rexnard Corp. v. Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001) (a patent "applicant is not required to describe in the specification every conceivable and possible future embodiment of his invention"); *SRI Int'l*

*v. Matsushita Elec. Corp of Am.*, 775 F.2d 1107, 1122 (Fed. Cir. 1985) (en banc) ("The law does not require the impossible. Hence, it does not require that an applicant describe in his specification every conceivable and possible future embodiment of his invention."). The record is devoid of any evidence from which the Court can determine whether biometrics and patterns are necessarily outside the scope of "code" as that term was used in the art in 1999 or whether biometrics and patterns are simply undescribed embodiments of a code.

Accordingly, the Court rejects Defendants' position that the "deblocking code" is necessarily a PIN and determines that "deblocking code" has its plain and ordinary meaning without the need for further construction.

### E. "protecting a mobile radiotelephony device"

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "protecting a mobile radiotelephony device" <br><br> • '654 Patent Claim 10 | ordinary meaning or no construction necessary | protecting a mobile radiotelephony device against theft |

**The Parties' Positions**

Plaintiff submits: This term is in the preamble of Claim 10, the body of which sets forth how the device is protected; thus, "protecting a mobile radiotelephony device" need not be construed. Further, the '654 Patent describes protecting a "device if it is lost, stolen or left without attendance for some time" (quoting '654 Patent col.4 ll.18–20). The "protecting" of Claim 10 is not limited to protecting against theft, as Defendants propose. (Dkt. No. 42 at 9–10.)

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '654 Patent col.4 ll.18–20.

Defendants respond: The preamble of Claim 10 provides the antecedent basis for "mobile radiotelephony device" in the body of the claim and provides context necessary to understand the

24

claim; thus, the preamble is limiting. As set forth in the title, abstract, and description of the patent, and as understood during prosecution of the patent, the "protecting" of the invention is protecting against theft. As described in the patent, "there is no meaningful difference between theft and the unauthorized use after a device is 'lost, stolen or left without attendance for some time'" (quoting '654 Patent col.4 ll.18–20). (Dkt. No. 47 at 13–15.)

In addition to the claims themselves, Defendants cite the following **intrinsic evidence** to support their position: '654 Patent, at [54] Title, [57] Abstract, col.1 ll.60–65, col.4 ll.18–20; '654 Patent File Wrapper February 19, 2004 Office Action at 10 (Plaintiff's Ex. H, Dkt. No. 42-9 at 12).

Plaintiff replies: The preamble term "protecting" does not appear in the body of the claim and it is not necessary to understand the limitations provided in the body of the claim. Thus, "protecting" need not be construed at all and in any event should not be construed as "protecting against theft" as the patent teaches protecting against things other than theft. (Dkt. No. 48 at 4.)

## **Analysis**

The issue in dispute is whether "protecting a mobile radiotelephony device" in the preamble of Claim 10 necessarily requires protecting against theft. It does not.

The term "protecting" in Claim 10's preamble, which recites "[a] method of protecting a mobile radiotelephony device, the method comprising," is a non-limiting statement of purpose. "Generally, the preamble does not limit the claims." *Allen Eng'g Corp. v. Bartell Indus.*, 299 F.3d 1336, 1346 (Fed. Cir. 2002). Under Federal Circuit precedent, "a preamble is not limiting where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention." *Acceleration Bay, LLC v. Activision Blizzard, Inc.*, 908 F.3d 765, 770 (Fed. Cir. 2018) (quotation marks and citations omitted). The preamble

may be limiting when it provides antecedent basis for terms in the body of the claim. *Catalina Mktg. Int'l v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) ("dependence on a particular disputed preamble phrase for antecedent basis may limit claim scope because it indicates a reliance on both the preamble and claim body to define the claimed invention"). But even if some terms in the preamble provide the antecedent basis for terms in the body does not necessarily make the entire preamble limiting. *TomTom, Inc. v. Adolph*, 790 F.3d 1315, 1323 (Fed. Cir. 2015) ("the court erred in determining that it had to construe the entire preamble if it construed a portion of it"). Specifically, a portion of a preamble providing only a statement of intended use of the invention is nonlimiting even if other portions of the preamble are limiting. *Id*. Here, a "method of protecting" is a statement of intended use of the method. The steps recited in the body of claim set forth a structurally complete invention with reference to what is done with the mobile device. As such, "protecting" is not limiting and need not be construed.

Even if the Court construed the preamble as limiting, it would be improper to limit Claim 10 to "protecting against theft." The '654 Patent provides a variety of potential protecting scenarios in addition to "theft" that invoke various device-blocking modes. "The first blocking mode is applied in the case where the device has been lost or stolen. The object is then to prevent the device being usable with another identification module." '654 Patent col.4 ll.11–12. "The second blocking mode is applied in the case where the identification module that is linked to the device is in its place inside the device and the device is in a state of availability. The object is to prevent a third party being able to send outgoing calls with this device if it is lost, stolen or left without attendance for some time." *Id*. at col.4 ll.15–20. The Court rejects outright Defendants' contention that there is no meaningful difference between protecting a device that is stolen (i.e., via theft) and one that is lost or left without attendance for some time.

Accordingly, the Court rejects Defendants' proposal to limit Claim 10 to "protecting against theft" and determines that the preamble of Claim 10 does not need to be construed.

### F. "blocking means for preventing a normal operation of the mobile radiotelephony device"

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "blocking means for preventing a normal operation of the mobile radiotelephony device" <br><br> • '654 Patent Claim 1 | subject to 35 U.S.C. § 112, ¶ 6 <br><br> **function**: preventing a normal operation of the mobile radiotelephony device <br><br> **structure**: described at col. 1:6-16, 40-59; col.2:20-32, and line 35-4:37; col. 5:28-6:53; Abstract; Figs. 1-3—a microprocessor assembly capable of entering any of the three disclosed blocking states to prevent a normal operation of the device, and equivalents thereof (Dkt. No. 42 at 10–14) | subject to 35 U.S.C. § 112, ¶ 6 <br><br> **function**: preventing a normal operation of the mobile radiotelephony device <br><br> **structure**: indefinite |

<u>**The Parties' Positions**</u>

Plaintiff submits: The '654 Patent provides three blocking states for preventing normal operation of the device, and the claimed structure "for preventing a normal operation of mobile radiotelephony device" is thus a "microprocessor assembly capable of entering any of the three disclosed blocking states." In the first blocking state, the device is disconnected from the network. In the second blocking state, the device processes only incoming calls or, alternatively, only incoming calls and outgoing calls to emergency numbers. In the third blocking state, the device is entirely locked down. While an algorithm is not required, the "specification clearly describes multiple steps that comprise an algorithm." (Dkt. No. 42 at 10–14.)

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '654 Patent figs.1–2, col.2 ll.37–47, col.2 ll.49–52, col.2 ll.55–58, col.3 ll.17–18, col.3 ll.44–61.

Defendants respond: The blocking means' recited function is not coextensive with a microprocessor and thus a microprocessor alone cannot provide the requisite structure for the "blocking means." To satisfy 35 U.S.C. § 112, ¶ 6, the patent must provide an algorithm for the function. As expressed in Claim 1, the "blocking means" is activated by a "timing means" and deactivated by a "deblocking code." Thus, the "blocking means" corresponds strictly to the second blocking state described in the patent; i.e., the patent's descriptions of the first and third blocking states, neither of which involve a timing means or a deblocking code, do not inform the structure of the claimed "blocking means." As there is no description of how normal operation of the device is prevented in the second blocking state, there is no algorithm and the '654 Patent does not satisfy § 112, ¶ 6. (Dkt. No. 47 at 16–19.)

In addition to the claims themselves, Defendants cite the following intrinsic and extrinsic evidence to support their position: **Intrinsic evidence**: '654 Patent col.3 ll.14–31, col.3 ll.32–63. **Extrinsic evidence**: Medvidovic Decl. ¶¶ 71–78 (Defendants' Ex. 1, Dkt. No. 47-2).

Plaintiff replies: The claim-recited function of the "blocking means" does not include the timing function that Defendants assume in their argument. Thus, all three described blocking states inform the structure of the "blocking means." Even if a timing function was read into the "blocking means," the third blocking state utilizes a timer. Finally, the patent describes that the second blocking state includes "no less than 5 steps relating to" the recited function. (Dkt. No. 48 at 8–9.)

Plaintiff cites further **intrinsic evidence** to support its position: '654 Patent fig.3, col.2 ll.25–31, col.2 ll.35–60, col.2 l.61 – col.3 l.63.

## Analysis

The issue in dispute is whether the '654 Patent properly provides structure for performing the function of "preventing a normal operation of the mobile radiotelephony device." It does. The patent describes three way in which the mobile device may prevent the normal operation: First, by disconnecting from the network (in the "first blocking state"). Second, by processing only incoming calls, and potentially outgoing calls to emergency numbers (in the "second blocking state"). Third, by totally locking down the device so that no calls are processed (in the "third blocking state").

To begin, the Court rejects Defendants' position that the "blocking means" is limited to the "second blocking state" described in the '654 Patent. While Claim 1 requires a "timing means for activating the blocking means" the claim does not limit activation of the blocking means to only the timing means and the "blocking means" function does not include any activation limitation. Claim 1 is an open-ended claim with a "comprising" transition and thus, allows for other activation means. *See Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997) ("'Comprising' is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim."). Indeed, the patent provides two ways in which the device may be placed in a blocking state: "a device in accordance with the invention . . . prevents the normal operation of the mobile radiotelephony device in response to the verification of the user identification module and in response to the detection of the period of inactivity of the mobile radiotelephony device." '654 Patent col.1 ll.41–51; *see also, id.* at col.3 ll.14–16 ("If the identification module, which is placed inside the device, is not the one that is linked to the device (arrow N4), the device goes to a first blocking state indicated in box K5."). The Court will not adopt the negative limitation excluding the "in response

to the verification of the user identification module" activation implicit in Defendants' argument. Neither the "blocking means" nor the claim is so limited. Indeed, Claim 9, which depends from Claim 1, is directed to a "test means for activating the blocking means when any unlinked user identification module is mounted inside the mobile radiotelephony device." *Id*. at col.5 ll.22–23. Further, the patent teaches that a blocking means may be activated in multiple ways. *See, e.g., id*. at col.3 ll.32–48 (activating the second blocking state based on a period of mobile-device inactivity), col.4 ll.23–30 (activating the second blocking state based on using an unlinked user identification module). The function of the "blocking means" is "preventing a normal operation of the mobile radiotelephony device" without regard to what activates the blocking means.

The Court also rejects Plaintiff's position that the "blocking means" structure does not require an algorithm. The mobile radiotelephony device of the '654 Patent is described as including a microprocessor, memory, and a card reader. *See, e.g.*, '654 Patent col.2 ll.48–60. There is nothing suggesting that these components are anything but generic computing components. It is the configuration of these generic computing components that constitutes the invention. And there is no disclosure of the functions of the "blocking means" (or any of the "means" limitations) being performed by other than these generic computing devices. Thus, the Court understands that the "means" functions are software implemented on the microprocessor-based mobile device and thus require an algorithm as structure. *See, e.g.*, *EON Corp. IP Holdings LLC v. AT&T Mobility LLC*, 785 F.3d 616, 623 (Fed. Cir. 2015) ("A microprocessor or general purpose computer lends sufficient structure only to basic functions of a microprocessor. All other computer-implemented functions require disclosure of an algorithm.").

The '654 Patent provides three approaches to "preventing normal operation of mobile radiotelephony device." First, disconnecting the device from the network. '654 Patent col.3 ll.17–

18 ("In this first blocking state, the device is disconnected from the network. Thus it can no longer receive an incoming call nor transmit an outgoing call (possibly with the exception of emergency numbers)."). Second, refusing to process outgoing calls (or non-emergency outgoing calls). *Id*. at col.3 ll.44–46 ("In this second blocking state the device only processes incoming calls (box K13) and, possibly, the outgoing calls that correspond to emergency numbers (box K14)."). Third, refusing to process all outgoing calls. *Id*. at col.3 ll.58–63 ("[The activation condition being met] causes the total blocking of the device indicated in box K30. To leave this third blocking state it is necessary to contact the organization that provides the identification module."). These disclosures are more than restatements of the function, they describe how the device prevents normal operation and thus qualify as structure. *See Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1385 (Fed. Cir. 2011).

The Court rejects Plaintiff's structural citations in the P.R. 4-5(d) chart as unhelpful. (Dkt. No. 52-2 at 3.) They are overly broad citations that constitute the vast majority of the patent and encompass entirely irrelevant material. For instance, Plaintiff's citations include discussions of blocking-activation means which are separately recited in the claims (e.g., the "timing means" of Claim 1, the "locking means" of Claim 4, and the "test means" of Claim 9).

Accordingly, the Court construes "blocking means for preventing a normal operation of the mobile radiotelephony device" under 35 U.S.C. § 112, ¶ 6 as follows:

- **function**: "preventing a normal operation of the mobile radiotelephony device"

- **structure**: "the mobile radiotelephony device implementing any of the following: (1) disconnecting the device from the network (col.3 ll.17–18), (2) ceasing to process all or non-emergency outgoing calls (col.3 ll.44–46), and (3) ceasing to process all calls (col.3 ll.58–63), and equivalents thereof"

**G.** **"timing means for activating the blocking means in response to the mobile radiotelephony device being inactive during the normal operation of the mobile radiotelephony device for a defined period of time subsequent to a mounting of a linked user identification module inside the mobile radiotelephony device"**

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "timing means for activating the blocking means in response to the mobile radiotelephony device being inactive during the normal operation of the mobile radiotelephony device for a defined period of time subsequent to a mounting of a linked user identification module inside the mobile radiotelephony device"<br><br>• '654 Patent Claim 1 | subject to 35 U.S.C. § 112, ¶ 6<br><br>**function**: activating the blocking means in response to the mobile radiotelephony device being inactive during the normal operation of the mobile radiotelephony device for a defined period of time subsequent to a mounting of a linked user identification module inside the mobile radiotelephony device<br><br>**structure**: described at Col. 1:6-16, 40-59; col.2:20-32; col. 3:32-4:37; col.5:28-6:53; Abstract; Figs. 1-3 for performing the function—a microprocessor assembly capable of entering any of the three disclosed blocking states to prevent a normal operation of the device, and equivalents thereof (Dkt. No. 42 at 14-15) | subject to 35 U.S.C. § 112, ¶ 6<br><br>**function**: "activating the blocking means in response to the mobile radiotelephony device being inactive during the normal operation of the mobile radiotelephony device for a defined period of time subsequent to a mounting of a linked user identification module inside the mobile radiotelephony device"<br><br>**structure**: "a microprocessor implementing the two-step algorithm set forth at col.3 ll.32-43" |

**The Parties' Positions**

Plaintiff submits: Timing "is a well-known function of a microprocessor" and the microprocessor itself is the structure of the "timing means." If an algorithm is necessary, the '654 Patent provides that "a period of time T is checked against a predefined period of time to determine if the device has remained in the state of availability for a certain period of time T, and if the period of time T exceeds that certain period of time, the device is placed in a blocking state." (Dkt. No. 42 at 14–15.)

In addition to the claims themselves, Plaintiff cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '654 Patent col.3 ll.32–43. **Extrinsic evidence**: Easttom Decl.[7] ¶¶ 44–45 (Plaintiff's Ex. G, Dkt No. 42-8);[8] Medvidovic Decl. ¶ 80 (Defendants' Ex. 1, Dkt. No. 47-2).

Defendants respond: The timing means' recited function is not coextensive with a microprocessor and thus a microprocessor alone cannot provide the requisite structure for the "timing means." Notably, the function of the "timing means" is more than just "timing." So even if "timing" in general is coextensive with a microprocessor, the recited function is not. To satisfy 35 U.S.C. § 112, ¶ 6, the patent must provide an algorithm for the function. The only algorithm for performing the recited function, which defines the timing period as "subsequent to a mounting of a linked user identification module inside the radiotelephony device," is provided in the '654 Patent at column 3, lines 32–43. Plaintiff's proposed algorithm does not account for the "subsequent to" aspect of the function, which requires that the timing means "is only activated after the mobile device confirms that the linked user identification module is mounted in the device." (Dkt. No. 47 at 19–22.)

In addition to the claims themselves, Defendants cite the following intrinsic and extrinsic evidence to support their position: **Intrinsic evidence**: '654 Patent fig.3, col.3 ll.14–16, col.3 ll.32–43. **Extrinsic evidence**: Medvidovic Decl. ¶¶ 81–83 (Defendants' Ex. 1, Dkt. No. 47-2).

---

[7] Rebuttal Declaration of Dr. William C. Easttom II (Chuck Easttom) Concerning Claim Construction of U.S. Patent No. 6,836,654.

[8] The Court has granted Defendants' Motion to Strike the Untimely Rebuttal Declaration of Dr. William C. Easttom II (Chuck Easttom) Concerning Claim Construction of U.S. Patent No. 6,836,654 (Dkt. No. 41). (Dkt. No. 59). Thus, the Court does not rely on anything provided in that declaration in reaching its construction of the "timing means . . ." limitation.

Plaintiff replies: "[S]etting up a timer does not require any special programming." Further, the function of the timing means does not include any confirmation of mounting of the linked user identification module. Finally, the algorithm it proposed in its opening brief accounts for the "subsequent to a mounting of a linked user identification module" aspect of the recited function in that if a "device is in a state of availability, it is 'subsequent to . . . a mounting of a linked user identification module inside the . . . device." (Dkt. No. 48 at 9–10.)

**<u>Analysis</u>**

The disputed issue is the identity of the structure in the '654 Patent for performing the function of "activating the blocking means in response to the mobile radiotelephony device being inactive during the normal operation of the mobile radiotelephony device for a defined period of time subsequent to a mounting of a linked user identification module inside the mobile radiotelephony device." The patent describes measuring the time of device inactivity following insertion of the linked user identification module into the device, comparing that time to a predetermined time, and proceeding to a blocking state if the time is at least the predetermined time.

To begin, the Court rejects Plaintiff's position expressed in the P.R. 4-5(d) chart. (Dkt. No. 52-2 at 4–5.) The structural citations in the P.R. 4-5(d) chart are unhelpful and overly broad. They constitute the vast majority of the patent and encompass entirely irrelevant material. For instance, Plaintiff's citations include discussions of blocking, deblocking, locking, and connecting functions which are separately recited in the claims (e.g., the "blocking means" and "deblocking means" of Claim 1, the "locking means" of Claim 6). As set forth above in the "blocking means" section, the Court rejects Plaintiff's position that the "timing means" structure does not require an algorithm.

The '654 Patent provides a blocking-means activation algorithm in which the time of device inactivity following insertion of the linked user identification module is measured and compared

34

to a predetermined time to select a state: (1) if the time of inactivity is at least the predetermined time, the device proceeds to a blocking state, and (2) if the time is less than the predetermined time, the device persists in its normal state. Specifically, the patent provides:

> If the identification module that is placed inside the device is linked to the device (arrow Y4), one looks whether the device has remained in the state of availability for a certain period of time T of the order of several minutes, for example (box K10). If this is not the case (arrow N10), the device remains in the state of availability indicated in box K1. If this is the case (arrow Y10), the device passes on to a second blocking state indicated in box K11.

'654 Patent col.3 ll.31–39. The Court agrees with Defendants that the timing means is engaged only after insertion of the linked user identification module. But the confirmation that the inserted user identification module is the linked module is performed separate from the timing-based activation of the blocking means. *See, e.g., id.* at col.3 ll.9–13 ("If [the mobile device] is locked (arrow Y3), one looks whether the identification module which is placed inside the device is the one that is linked to the device (box K4)."). It is this confirmation (or verification) step, "box K4" in Figure 3, that activates the timing means.

The Court rejects Defendants' proposed structural citation as potentially encompassing too much structure. For example, it includes reference to initializing a counter that is used to count the number of times an improper deblocking code is entered. *Id.* at col.3 ll.39–43. *See Micro Chem., Inc.*, 194 F.3d at 1258 (§ 112, ¶ 6 does not "permit incorporation of structure from the written description beyond that necessary to perform the claimed function").

Accordingly, the Court construes "timing means for activating the blocking means in response to the mobile radiotelephony device being inactive during the normal operation of the mobile radiotelephony device for a defined period of time subsequent to a mounting of a linked user identification module inside the mobile radiotelephony device" under 35 U.S.C. § 112, ¶ 6 as follows:

- **function**: "activating the blocking means in response to the mobile radiotelephony device being inactive during the normal operation of the mobile radiotelephony device for a defined period of time subsequent to a mounting of a linked user identification module inside the mobile radiotelephony device"

- **structure**: "a device with a microprocessor assembly programmed to execute the algorithms set forth in the '654 Patent at col.3 ll.32-43, and equivalents thereof"

**H.** **"deblocking means for permitting the normal operation of the mobile radiotelephony device in response to a supply of a deblocking code to the mobile radiotelephony device subsequent to the mounting of the linked user identification module inside the mobile radiotelephony device and subsequent to the defined period of time"**

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "deblocking means for permitting the normal operation of the mobile radiotelephony device in response to a supply of a deblocking code to the mobile radiotelephony device subsequent to the mounting of the linked user identification module inside the mobile radiotelephony device and subsequent to the defined period of time"<br><br>• '654 Patent Claim 1 | subject to 35 U.S.C. § 112, ¶ 6<br><br>**function**: permitting the normal operation of the mobile radiotelephony device<br><br>**structure**: described at Col. 1:6-16, 40-59; col.1:66-2:17:20-32, and line 35-:37; col. 5:28-6:53; Abstract; Figs. 1-3 for performing the function—a microprocessor assembly, optional coupled with a screen and man-machine interface, capable of leaving either the first or second disclosed blocking states to permit a normal operation of the device, and equivalents thereof. (Dkt. No. 42 at 15-18) | subject to 35 U.S.C. § 112, ¶ 6<br><br>**function**: permitting the normal operation of the mobile radiotelephony device in response to a supply of a deblocking code to the mobile radiotelephony device subsequent to the mounting of the linked user identification module inside the mobile radiotelephony device and subsequent to the defined period of time<br><br>**structure**: indefinite |

### The Parties' Positions

Plaintiff submits: The function of the "deblocking means" differs from that of the "blocking means" in that the deblocking means is "for permitting the normal operation of the mobile radio telephony device" rather than "preventing" the normal operation of the device. Defendants' functional language beyond "for permitting the normal operation of the mobile radio telephony device" is "not necessary for the function as it is [a] descriptive limitation that explains when the permitting function is performed." Regardless, the structure for performing the function is "a microprocessor assembly, optional[ly] coupled with a screen and man-machine interface, capable of leaving either the first or second disclosed blocking states to permit a normal operation of the device, and equivalents thereof." This does not require any special programming, but if "an algorithm is necessary, the '654 patent clearly discloses an algorithm for permitting normal operation of the radio telephony device." For example, the patent teaches inviting the user to enter a code, checking whether the code is recognized, and, if so, placing the device in a state of availability (citing '654 Patent col.3 ll.44–57). (Dkt. No. 42 at 15–18.)

In addition to the claims themselves, Plaintiff cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '654 Patent col.3 ll.17–27, col.3 ll.44–57. **Extrinsic evidence**: Easttom Decl. ¶ 47 (Plaintiff's Ex. G, Dkt No. 42-8).[9]

Defendants respond: The function of the "deblocking means" includes the entire "permitting the normal operation . . . in response to supply of . . . subsequent to the mounting of . . . subsequent to the defined period of time" clause. Further, Plaintiff submitted Defendants' proposed function

---

[9] The Court has granted Defendants' Motion to Strike the Untimely Rebuttal Declaration of Dr. William C. Easttom II (Chuck Easttom) Concerning Claim Construction of U.S. Patent No. 6,836,654 (Dkt. No. 41). (Dkt. No. 59). Thus, the Court does not rely on anything provided in that declaration in reaching its construction of the "deblocking means . . ." limitation.

as the deblocking means' function in copending litigation over the '654 Patent.[10] The deblocking

means' recited function is not coextensive with a microprocessor and thus, a microprocessor alone

cannot provide the requisite structure for the "deblocking means." To satisfy 35 U.S.C. § 112, ¶ 6,

the patent must provide an algorithm for the function. And the '654 Patent does not include a

disclosure of an algorithm for deblocking in response to a supply of the deblocking code supplied

"subsequent to the mounting of the linked user identification module . . . and subsequent to the

defined period of time." (Dkt. No. 47 at 22–24.)

In addition to the claims themselves, Defendants cite the following **extrinsic evidence** to

support their position: Medvidovic Decl. ¶ 92 (Defendants' Ex. 1, Dkt. No. 47-2).

Plaintiff replies: The timing limitations of the claim specify that the deblocking happens after

the blocking and the algorithm at column 3, lines 44–57 specifies this timing. (Dkt. No. 48 at 10–

11.)

### Analysis

There are two issues in dispute. First, whether the function of the "deblocking means" is the

entirety of "permitting the normal operation of the mobile radiotelephony device in response to a

supply of a deblocking code to the mobile radiotelephony device subsequent to the mounting of

the linked user identification module inside the mobile radiotelephony device and subsequent to

the defined period of time." It is. Second, whether the '654 Patent properly provides structure for

performing the function. It does.

---

[10] Defendants cite Exhibit B to the Joint Claim Construction Statement Pursuant to P.R. 4-3(d) submitted on November 5, 2019 as Dkt. No. 121-2 in *Uniloc 2017 LLC v. Google LLC*, Case No. 2:18-cv-00493-JRG-RSP (E.D. Tex.) and submit that exhibit here as Defendants' Exhibit 7, Dkt. No. 47-8.

The function of the "deblocking means" includes all the language recited in the claim. Specifically, the function is not simply "permitting the normal operation" of the mobile device. Rather, it is permitting the normal operation of the device "in response to a supply of a deblocking code" that is supplied "subsequent to the mounting of the linked user identification module inside the mobile radiotelephony device and subsequent to the defined period of time." Here, "the defined period of time" and "the mounting of the linked user identification module inside the mobile radiotelephony device" refer to "a defined period of time subsequent to a mounting of a linked user identification module inside the mobile radiotelephony device" recited in the timing-means limitation. Thus, the function requires supply of the deblocking code after the conditions for the timing means to activate the blocking means are met. The function, however, does not require determining whether those conditions are met.

For the reasons stated above, the Court determines that an algorithm is required for this microprocessor-implemented means-plus-function limitation. Also as provided above, the Court rejects Plaintiff's structural citations expressed in the P.R. 4-5(d) chart (Dkt. No. 52-2 at 5–6) as they constitute the vast majority of the patent and encompass entirely irrelevant material.

The '654 Patent teaches using a deblocking code to restore normal operation of the device after it enters a blocking state due to an extended period of inactivity. As described above in the section on "timing means . . .," the patent provides that the mobile device enters a blocking state after a certain period of inactivity following insertion of the linked user identification card. '654 Patent col.3 ll.9–13, col.3 ll.31–39. Once in this time-out blocking state the user of the device is provided some number of opportunities to enter a deblocking code to restore the device to normal operations. If the correct code is entered, the device resumes normal operation. If an incorrect code is entered, the device persists in the blocked state. Specifically, the patent provides:

In the second blocking state K11 a message inviting the user to supply a deblocking code is displayed on the screen. If the code taken 50 by the user is recognized (arrow Y11), the device goes back to the state of availability indicated in box Kl. If it is not recognized (arrow N11), the value of the variable A is tested (box Kl5). If this value is lower than a certain figure (for example 3), the value of A is augmented by unity (box K16) and a message is displayed on the screen to indicate the user that the code is not valid (box K17). Then the device goes back to the second blocking state indicated in box K11. If the variable A is higher than or equal to said figure, the test of box Kl5 causes the total blocking of the device indicated in box K30.

*Id*. at col.3 ll.48–61. The portion of this algorithm that refers to counting the number of incorrect entries of deblocking codes is not necessary to the claimed function and therefore is not a necessary part of the "deblocking means" structure. *See Micro Chem., Inc.*, 194 F.3d at 1258.

Accordingly, the Court construes "deblocking means for permitting the normal operation of the mobile radiotelephony device in response to a supply of a deblocking code to the mobile radiotelephony device subsequent to the mounting of the linked user identification module inside the mobile radiotelephony device and subsequent to the defined period of time" under 35 U.S.C. § 112, ¶ 6 as follows:

- **function**: "permitting the normal operation of the mobile radiotelephony device in response to a supply of a deblocking code to the mobile radiotelephony device subsequent to the mounting of the linked user identification module inside the mobile radiotelephony device and subsequent to the defined period of time"

- **structure**: "a device with a microprocessor assembly programmed to execute the algorithms set forth in the '654 Patent at col.3 ll.44-52, and equivalents thereof"

## I. "locking means for facilitating an activation of the block means by the timing means" and "block means"

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "locking means for facilitating an activation of the block means by the timing means"<br><br>• '654 Patent Claim 4 | subject to 35 U.S.C. § 112, ¶ 6<br><br>**function**: facilitating an activation of the block means by the timing means<br><br>**structure**: described at Col. 1:6-16, 40-59; col. 1:66-2:17;20-32, and line 35-4:37; col. 5:28-6:53; Abstract; Figs. 1-3 for performing the function—a microprocessor assembly coupled to a screen and keypad, with a man machine interface, and a card reader, and equivalents thereof. (Dkt. No. 42 at 18-20) | subject to 35 U.S.C. § 112, ¶ 6<br><br>**function**: facilitating an activation of the block means by the timing means<br><br>**structure**: indefinite |
| "block means"<br><br>• '654 Patent Claim 4 | blocking means | subject to 35 U.S.C. § 112, ¶ 6<br><br>**function**: indefinite<br><br>**structure**: indefinite |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

### The Parties' Positions

Plaintiff submits: In Claim 4, "the block means" refers back to the "blocking means" introduced in Claim 1, from which Claim 4 depends. Claim 1 provides only "blocking means" and not "block means" and the examiner interpreted "block means" as "blocking means" when examining the application that issued as the '654 Patent. Thus, the error in "block means" is obviously clerical and the term should be construed as "blocking means." The function of the "locking means" is "facilitating an activation of the blocking means." As described in the patent,

a device is locked when data on a user identification module is read into device memory, and the data in memory is then subsequently compared to data in a user identification module placed in the device to determine if it is the original user identification module. If so, the timing means checks the period of time the device has been available and enters the second blocking state if appropriate. "Reading and comparing data is a known function of a microprocessor, and no algorithm is needed." If an algorithm is necessary, the '654 Patent provides that "if the device is locked, the identification module which is placed inside the device is checked to see if it is the one that had its data read out and stored." (Dkt. No. 42 at 18–20.)

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '654 Patent col.2 ll.35–60, col.2 ll.65–67, col.3 ll.1–6, col.3 ll.32–43; '654 Patent File Wrapper December 2, 2003 Response (Plaintiff's Ex. D, Dkt. No. 42-5 at 6), February 19, 2004 Office Action (Plaintiff's Ex. H, Dkt. No. 42-9 at 5–6).

Defendants respond: The term "block means" appears only in Claim 4, and nowhere else in the '654 Patent and therefore there is no antecedent basis for "the block means." Thus, the term is indefinite. Contrary to Plaintiff's position, "block means" is not an obvious typographic error of "blocking means." The patent does not relate "locking" with facilitating activation of a "blocking means" and thus it is not clear if the "block means" refers to "blocking means" or perhaps a "lock means" or "linking means." With respect to the "locking means," the function of the "locking means" expressly includes facilitating an activation "by the timing means." In fact, Plaintiff submitted Defendants' proposed function as the locking means' function in copending litigation over the '654 Patent.[11] The only discussion of "locking" in the patent corresponds to the "locking

---

[11] Defendants cite Exhibit B to the Joint Claim Construction Statement Pursuant to P.R. 4-3(d) submitted on November 5, 2019 as Dkt. No. 121-2 in *Uniloc 2017 LLC v. Google LLC*, Case No.

means" of Claim 6, which has a different function than that of Claim 4. The patent fails to provide any algorithm for the function of Claim 4's "locking means." (Dkt. No. 47 at 24–27.)

In addition to the claims themselves, Defendants cite the following intrinsic and extrinsic evidence to support their position: **Intrinsic evidence**: '654 Patent col.2 l.65 – col.3 l.13. **Extrinsic evidence**: Medvidovic Decl. ¶¶ 98–100 (Defendants' Ex. 1, Dkt. No. 47-2).

Plaintiff replies: "The locking means facilitates the activation of the blocking means by allowing the operation flow to proceed to the second blocking state." The description of this flow provides the algorithm for performing the "locking means" function. The "locking means" of Claim 6 is irrelevant to the "locking means" of Claim 4. (Dkt. No. 48 at 11.)

**Analysis**

There are two issues in dispute. First, whether "block means" in Claim 4 is the "blocking means" of Claim 1. It is. Second, whether the '654 Patent properly provides structure for performing the function of "facilitating an activation of the block means by the timing means." It does not. There is no structure in the '654 Patent that is clearly linked or associated with the recited function of the "locking means" and Claim 4 therefore does not satisfy 35 U.S.C. § 112, ¶ 6.

The "block means" of Claim 4 plainly refers back to the "blocking means" of Claim 1. Claim 4 provides:

> The mobile radiotelephony device of claim 1, further comprising:
>   locking means for facilitating an activation of the block means by the timing means.

'654 Patent col.4 ll.64–67. There are two things to note regarding "block means." First, the claim refers to "the block means," indicating that it refers to a claim element previously recited in the dependency chain. Thus, it refers to something in Claim 1. Second, the "block means" of Claim 4

2:18-cv-00493-JRG-RSP (E.D. Tex.) and submit that exhibit here as Defendants' Exhibit 7. (Dkt. No. 47-8.)

is something that is activated by "the timing means." This "timing means" refers to the "timing means" of Claim 1, which is expressly "for activating the blocking means." In this context, the only reasonable interpretation of "the block means" is "the blocking means." *CBT Flint Partners, LLC v. Return Path, Inc.*, 654 F.3d 1353, 1358 (Fed. Cir. 2011) (finding that a court may correct an obvious error in the claim if "(1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims.").

For the reasons stated above, the Court determines that an algorithm is required for this microprocessor-implemented means-plus-function limitation. Also as provided above, the Court rejects Plaintiff's structural citations expressed in the P.R. 4-5(d) chart (Dkt. No. 52-2 at 6) as they constitute the vast majority of the patent and encompass entirely irrelevant material.

While there may be some locking structure disclosed in the '654 Patent, the patent fails to clearly link or associate any definite structure with the recited function of the "locking means." To begin, there is no mention in the patent of "facilitating" any activation of a blocking state, by a locking means or otherwise. And while the patent describes that "locking (L)/unlocking (UL) is done by accessing a configuration menu of the device," this locking is described in the context of linking a user identification module to the device, it is not clearly linked to "facilitating an activation of the block[ing] means by the timing means." '654 Patent col.2 l.66 – col.3 l.2. Plaintiff identifies the following algorithm for the recited function:

> if the device is locked, the identification module which is placed inside the device is checked to see if it is the one that had its data read out and stored. If the identification module that is placed inside the device is the same device, the timing means checks to see if the device has remained in the state of availability for a certain period of time, and when the time is exceeded, the device passes on to a blocking state.

(Dkt. No. 42 at 19.)

But this describes determining whether the user identification module in the device is the linked module and proceeding appropriately. This determination is elsewhere described in the claim set as implemented by a "test means" and as "verifying" the module. '654 Patent col.5 ll.22–26 (Claim 9), col.5 ll.30–32 (Claim 10), col.6 ll.20–23 (Claim 17). Ultimately, while this determination is disclosed, it is not clearly linked to the recited function of the "locking means." *See Med. Instrumentation and Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1218 (Fed. Cir. 2003) ("It is not enough simply to list a certain structure in the specification; that structure must also be clearly linked to a claimed function in order to be a corresponding structure for that function.").

Accordingly, the Court determines that the '654 Patent fails to satisfy the structure-disclosure requirements of 35 U.S.C. § 112, ¶ 6 and holds that Defendants have established that Claim 4 is indefinite.

**J.     "connecting means for establishing a link between the mobile radiotelephony device and the linked user identification module"**

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "connecting means for establishing a link between the mobile radiotelephony device and the linked user identification module"<br><br>• '654 Patent Claim 5 | subject to 35 U.S.C. § 112, ¶ 6<br><br>**function**: establishing a link between the mobile radiotelephony device and the linked user identification module<br><br>**structure**: described at Col. 1:6-16, 40-50; col. 1:66-2:17:20- 3:43; col. 3:64-4:37; col. 5:28-6:53; Abstract; Figs. 1-3 for performing the function—the microprocessor assembly, and a housing for receiving an identification module and/or a card reader, and equivalents thereof. (Dkt. No. 42 at 20-21) | subject to 35 U.S.C. § 112, ¶ 6<br><br>**function**: establishing a link between the mobile radiotelephony device and the linked user identification module<br><br>**structure**: the algorithms set forth at 1:66-2:10 and 2:67-3:2 |

**The Parties' Positions**

Plaintiff submits: As "linked" does not have a special meaning in the '654 Patent, the link between the module and the mobile device may be established simply by inserting the module into the housing of the device. The patent also provides that the "connecting means" may "comprise reading means and storage means," which correspond to a card reader and random-access memory (quoting '654 Patent col.1 ll.66–67). Ultimately, "[t]he structure covered by this element includes the microprocessor assembly, and a housing for receiving an identification module and/or a card reader, and equivalents thereof. Since reading data and storing data are well-known functions of a microprocessor, and the microprocessor is a component performing this function, no algorithm is necessary." (Dkt. No. 42 at 20–21.)

In addition to the claims themselves, Plaintiff cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '654 Patent col.1 ll.66–67, col.2 l.67 – col.3 l.6.

Defendants respond: The device of the '654 Patent prevents normal operation when an unlinked user identification module is inserted into the device, indicating that simply inserting the module into the device does not establish a link. To establish the link, the microprocessor must be "specifically programmed" to perform the establishing function. Thus, the structure of the "connecting means" is an algorithm, and the only algorithms for performing the establishing function disclosed in the '654 Patent are those at column 1, line 66 through column 2, line 10 and column 2, line 67 through column 3, line 2. (Dkt. No. 47 at 27–28.)

In addition to the claims themselves, Defendants cite the following intrinsic and extrinsic evidence to support their position: **Intrinsic evidence**: '654 Patent, at [57] Abstract, col.1 ll.6–11, col.1 l.60 – col.2 l.10, col.2 l.67 – col.3 l.2, col.3 ll.14–16. **Extrinsic evidence**: Medvidovic Decl. ¶¶ 39–40, 110–11 (Defendants' Ex. 1, Dkt. No. 47-2).

Plaintiff replies: The patent describes that one way to establish a link is to read data off the module and store it using a microprocessor including random-access memory and coupled to a card reader. "No programming is necessary as the step is performed automatically. . . . Thus, no algorithm is necessary." Further, Defendants propose two different algorithms and either is sufficient for performing the connecting means' function. (Dkt. No. 48 at 11–12.)

Plaintiff cites further **intrinsic evidence** to support its position:'654 Patent fig.2, col.1 l.66 – col.2 l.3, col.2 ll.59–60

**Analysis**

The issue in dispute is the identity of the structure provided in '654 Patent for performing the function of "establishing a link between the mobile radiotelephony device and the linked user identification module." The patent provides establishing a link by reading data from the user identification module placed in the mobile device and storing that data in the mobile device.

For the reasons stated above, the Court determines that an algorithm is required for this microprocessor-implemented means-plus-function limitation. Also as provided above, the Court rejects Plaintiff's structural citations expressed in the P.R. 4-5(d) chart (Dkt. No. 52-2 at 7) as they constitute the vast majority of the patent and encompass entirely irrelevant material.

The '654 Patent provides that the link between the linked user identification module and the mobile device is established by taking data from the module and storing it on the device. Specifically, the patent provides:

> In a particularly simple embodiment, the connecting means comprise reading means and storage means of a data stored in the identification module, and the test means compare the thus stored data with the data stored in the identification module which is place[d] inside the device. The data stored is formed, for example, by the international identification number IMSI which is contained in the identification module (compare standards relating to the GSM radiotelephony systems). Thus, the identification module is automatically linked to the device without the intervention of the user, more particularly without the fact that a specific code has to be entered.

'654 Patent col.1 l.66 – col.2 l.10. The patent further provides:

> When the user locks his device (box K2), the identification module that is inside the device is automatically linked to the device. For this purpose, the device starts reading a data D1 in the identification module (for example, the international identification number IMSI) and he stores it in the random-access memory 24.

*Id.* at col.2 l.66 – col.3 l.6

Accordingly, the Court construes "connecting means for establishing a link between the mobile radiotelephony device and the linked user identification module" under 35 U.S.C. § 112, ¶ 6 as follows:

- **function**: "establishing a link between the mobile radiotelephony device and the linked user identification module"

- **structure**: "the mobile radiotelephony device implementing the following algorithm: reading data stored on the user identification module and storing it on the mobile radiotelephony device (col.1 l.66 – col.2 l.10 and col.2 l.66 – col.3 l.6), and equivalents thereof"

K. **"test means for activating the blocking means when any unlinked user identification module is mounted inside the mobile radiotelephony device"**

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "test means for activating the blocking means when any unlinked user identification module is mounted inside the mobile radiotelephony device"<br><br>• '654 Patent Claim 9 | subject to 35 U.S.C. § 112, ¶ 6<br><br>**function**: activating the blocking means<br><br>**structure**: described at Col. 1:6-16, 40-50; col. 1:66-2:17;20-4:37; col. 5:28-6:53; Abstract; Figs. 1-3—a microprocessor coupled to a card reader, and equivalents thereof. (Dkt. No. 42 at 22-23) | subject to 35 U.S.C. § 112, ¶ 6<br><br>**function**: activating the blocking means when any unlinked user identification module is mounted inside the mobile radiotelephony device<br><br>**structure**: indefinite |

**The Parties' Positions**

Plaintiff submits: The '654 Patent describes comparing "stored data with the data stored in the identification module" (quoting '654 Patent col.1 l.66 – col.2 l.3) and looking to "whether the identification module which is placed inside the device is the one that is linked to the device" if the device is locked (quoting *id.* at col.3 ll.9–15). Both embodiments link the function performed to device memory and a card reader. Since comparing stored data and read data is "a standard function of a microprocessor" there is no need for an algorithm and the disclosed structure for the test means is "a microprocessor coupled to a card reader." If an algorithm is necessary, the patent

teaches "compar[ing] stored data with the data stored in the identification module; if there is no match, the device is placed into a blocking state." (Dkt. No. 42 at 22–23.)

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '654 Patent col.1 l.66 – col.2 l.3, col.2 l.67 – col.3 l.6, col.3 ll.9–15.

Defendants respond: The recited function of the "test means" includes "when any linked user identification module is mounted inside the mobile telephony device"; it is not simply "activating the blocking means" as Plaintiff contends. And while the patent describes a test means that compares data in the device to data on the identification module, it does not provide an algorithm for "activating the blocking means when any unlinked user identification module is mounted inside the mobile radiotelephony device." As the microprocessor of the device must be specially programmed to perform the claimed function, an algorithm is required. Plaintiff's proposed algorithm is incomplete as it does not state how the blocking state is engaged. By failing to provide an algorithm, the patent fails to satisfy § 112, ¶ 6. (Dkt. No. 47 at 28–30.)

In addition to the claims themselves, Defendants cite the following intrinsic and extrinsic evidence to support their position: **Intrinsic evidence**: '654 Patent col.1 l.66 – col.2 l.3, col.3 ll.14–16, col.3 ll.32–43, col.3 ll.58–61. **Extrinsic evidence**: Medvidovic Decl. ¶¶ 115, 117–18 (Defendants' Ex. 1, Dkt. No. 47-2).

Plaintiff replies: The embodiments described in the patent provide an algorithm for the test means' function. (Dkt. No. 48 at 12–13.)

### **Analysis**

There are two issues in dispute. First, whether the function of the "test means" is the entirety of "activating the blocking means when any unlinked user identification module is mounted inside

the mobile radiotelephony device." It is. Second, whether the '654 Patent properly provides structure for performing the function. It does not.

For the reasons stated above, the Court determines that an algorithm is required for this microprocessor-implemented means-plus-function limitation. Also as provided above, the Court rejects Plaintiff's structural citations expressed in the P.R. 4-5(d) chart (Dkt. No. 52-2 at 8) as they constitute the vast majority of the patent and encompass entirely irrelevant material.

While the '654 Patent teaches comparing link data on the mobile device with data on the user identification module as part of a "test means," the patent does not clearly link or associate this comparing with activating a blocking means, or even with determining whether the identification module is the linked module. Specifically, the patent provides:

> In a particularly simple embodiment, the connecting means comprise reading means and storage means of a data stored in the identification module, and ***the test means*** compare the thus stored data with the data stored in the identification module which is place[d] inside the device.

'654 Patent col.1 l.66 – col.2 l.3 (emphasis added). This disclosure does not link the comparing with any specific purpose. The patent further provides:

> When the user locks his device (box K2), the identification module that is inside the device is automatically linked to the device. For this purpose, the device starts reading a data D1 in the identification module (for example, the international identification number IMSI) and he stores it in the random-access memory 24. . . . If [the device] is locked (arrow Y3) one looks whether the identification module which is placed inside the device is the one that is linked to the device (box K4).

> If the identification module, which is placed inside the device, is not the one that is linked to the device (arrow N4), the device goes to a first blocking state indicated in box KS.

*Id*. at col.2 l.66 – col.3 l.16. This disclosure is little more than a paraphrase of the recited function. It does not provide how the "activating the blocking means when any unlinked user identification module is mounted inside the mobile radiotelephony device" is accomplished. While it is possible that one of ordinary skill in the art may infer activating a blocking means through comparing data

on the module with data on the device, enabling an inference is not the § 112, ¶ 6 standard. The statute requires specificity. *See, e.g.*, *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1384–85 (Fed. Cir. 2009) ("The question before us is whether the specification contains a sufficiently precise description of the 'corresponding structure' to satisfy section 112, paragraph 6, not whether a person of skill in the art could devise some means to carry out the recited function."); *Med. Instrumentation and Diagnostics Corp.*, 344 F.3d at 1218 ("It is not enough simply to list a certain structure in the specification; that structure must also be clearly linked to a claimed function in order to be a corresponding structure for that function.").

Accordingly, the Court determines that the '654 Patent fails to satisfy the structure-disclosure requirements of 35 U.S.C. § 112, ¶ 6 and holds that Defendants have established that Claim 9 is indefinite.

## IV.    CONCLUSION

The Court adopts the constructions above for the disputed and agreed terms of the '654 Patent. The Court further finds that Claims 4 and 9 of the '654 Patent are indefinite. Furthermore, the parties should ensure that all testimony that relates to the terms addressed in this Order is constrained by the Court's reasoning. However, in the presence of the jury, the parties should not expressly or implicitly refer to each other's claim construction positions and should not expressly refer any portion of this Order that is not an actual construction adopted by the Court. The references to the claim construction process should be limited to informing the jury of the constructions adopted by the Court.

**SIGNED this 20th day of January, 2020.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE